(No. 73899.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES HARRIS, Appellant.

*Opinion filed December 22, 1994.—Rehearing denied April 3, 1995.*

324

HARRISON, J., dissenting.

Charles Schiedel, Deputy Defender, and Charles Hoffman, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Gael McCaughey-O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, James Harris, was convicted of one count each of murder, attempted murder, and aggravated battery and of two counts of attempted armed robbery. The defendant received the death penalty for the murder conviction and sentences of imprisonment for the remaining felonies. In the defendant's prior appeal, this court vacated the death sentence on grounds of evidentiary error. In addition, the court determined that further proceedings were necessary for resolution of the defendant's allegations regarding the State's exclusion of minority members from his jury. (*People v. Harris* (1989), 129 Ill. 2d 123 (*Harris I*).) On remand, the circuit court found no infirmity in the manner in which the defendant's trial jury had been selected and, after a new sentencing hearing, reimposed the death penalty for the defendant's murder conviction. The sentence of death has been stayed pending direct review by this court. (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).) For the reasons that follow, we now affirm the judgment of the circuit court.

The evidence presented at trial is set forth in detail

in our original opinion in this case (see *Harris*, 129 Ill. 2d at 137-42) and will be summarized briefly here. The State's principal witness at trial was Theresa Woods, who worked as a waitress at a tavern owned by the murder victim, Jesse James, Sr. In her testimony, Woods stated that she and James closed the tavern around 2 a.m. on February 10, 1983. They left the premises together sometime between 3:30 and 4 o'clock that morning. Outside the building, a man, whom Woods later identified as the defendant, approached them and asked whether the buses were running at that hour. Woods replied that she did not know, and she and James then proceeded to cross the street to their cars. A short time later, as Woods and James stood next to their cars, the defendant approached them again. The defendant grabbed Woods and pointed a gun to her head. Following the defendant's instructions, James then got into the driver's seat of his car, while Woods sat in the back seat; the defendant sat in the front passenger's seat, next to James. The defendant then ordered James to drive a short distance and park in a nearby alley. There, the defendant demanded $300 from James and Woods, threatening to kill the two if they did not comply. The defendant explained that he had "nothing to lose" and did not care if he had to kill the victims, because he was going back to jail anyway.

James told the defendant that he kept some money at the tavern, and they returned to that area. When Woods left the car to get the money, the defendant warned her that he would kill James if she did not return within three minutes. Woods then ran into the tavern and grabbed whatever paper currency she and James had left in the two cash registers earlier that morning.

Woods returned to the car, and the defendant ordered her to get back in the vehicle. James told the

defendant that there was no need for Woods to do so, and James and the defendant had an exchange of words. According to Woods, the defendant then grabbed James and shot him. The defendant pushed James out of the car through the driver's door, and the defendant then got out of the vehicle from the same door.

Woods attempted to run away from the car, but she tripped and fell to the ground. The defendant then walked over to where Woods was lying, and swore at her. Woods pleaded with the defendant and raised her hands to protect herself. The defendant shot Woods at close range, hitting her in the shoulder. Woods lay motionless, and she later heard the sound of footsteps running from the scene. Woods got up, saw that James was still alive, and noticed that the car had crashed into the window of a nearby storefront. Woods then called the police.

Police officers who had been provided with a description of the offender soon arrested the defendant several blocks from the crime scene. James died later that morning. Because Woods was pregnant at the time, the bullet lodged in her shoulder was not removed until after the child was born.

At the conclusion of the trial, the defendant was found guilty of the murder of James, the attempted murder of Woods, the aggravated battery of Woods, and the attempted armed robbery of both Woods and James. The matter then proceeded to a bench sentencing hearing. The judge found the defendant eligible for the death penalty and determined that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The defendant was accordingly sentenced to death.

In the defendant's earlier appeal, this court determined that further proceedings were required for resolution of the *Batson* issue. The court also found revers-

ible error in the presentation of certain evidence at the sentencing hearing. We vacated the defendant's death sentence, and conditionally vacated his convictions and noncapital sentences subject to reinstatement. On remand, the trial court resolved the *Batson* issue adversely to the defendant and reinstated his convictions. A new sentencing hearing was then held, before a different judge, who sentenced the defendant to death for the murder conviction.

In the present appeal, the defendant raises several arguments regarding the further *Batson* proceedings conducted on remand from this court's opinion in *Harris I*. In addition, the defendant raises a number of challenges to the new sentencing hearing conducted below.

## I

The defendant was tried on these charges in April 1984. After the jury was selected and sworn, the defendant moved for a mistrial, contending that the prosecution had violated *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, by using its peremptory challenges to systematically exclude blacks from the jury selected in this case. The trial judge denied the motion, and the defendant was subsequently convicted of murder and sentenced to death. While the defendant's appeal was pending before this court, the United States Supreme Court decided *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, and *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708. *Batson* altered the evidentiary showing necessary to sustain a claim of improper jury selection, while *Griffith* held that the rule announced in *Batson* was applicable to cases pending on direct review at the time *Batson* was decided.

On May 1, 1987, this court issued an order instructing the circuit court to conduct further hearings in the present case in compliance with the requirements of

*Batson.* At the conclusion of the ensuing hearing, the trial judge found that the defendant had established a *prima facie* case of racial discrimination under *Batson.* The judge also found, however, that the prosecution had presented racially neutral explanations for all the peremptory challenges it had exercised against black members of the venire. The judge submitted his *Batson* findings to this court, which then considered the merits of the defendant's appeal.

At that time, the court upheld the circuit judge's determination that the defendant had shown a *prima facie* case of racial discrimination under *Batson.* The court also concluded that the prosecutor had supplied neutral explanations with regard to the exclusion of 12 of the 15 black venire members excused by the State. A majority of the court believed, however, that the record was not sufficiently clear with regard to the State's reasons for excluding three of the prospective jurors, and the court remanded the cause for further proceedings on the *Batson* issue, as well as for an unrelated sentencing error. (*Harris,* 129 Ill. 2d at 189-90.) *Harris I* identified the three persons as the 13th, 14th, and 15th jurors; we shall refer to them here by their respective names, Milton Pickett, Essie Taylor, and Betty Simmons.

As a preliminary matter, we note that both sides used all 20 peremptory challenges allotted to them. In *Harris I,* we found that the State excused 15 blacks from the venire and that two blacks served as jurors. (*Harris,* 129 Ill. 2d at 169.) We note also that one black served as an alternate juror. The two black jurors were part of the first panel of jurors selected in this case and were chosen at a time when the State still possessed a number of unused peremptory challenges.

*Milton Pickett.* Milton Pickett lived in Evanston. He was a forklift operator for Baxter, where he had been employed for 13 years, and he also worked evenings as a

barber. Pickett was married to a high school teacher, and he and his wife had one daughter, aged 12. Pickett's apartment had been broken into about four years earlier, and his car had been struck by a hit-and-run driver six months earlier. Pickett's brother-in-law was an Evanston police officer. Also, Pickett identified a friend who was a lawyer. When the trial judge heard the name of the friend, the judge asked Pickett whether the friend was a member of the Evanston city council; Pickett said that he was.

At the original *Batson* hearing conducted in this case, explanations for the State's challenges to black members of the venire were provided by Daniel Franks, who, as an assistant State's Attorney, had taken part in the jury selection at the defendant's trial. Franks cited three reasons for the removal of Milton Pickett. Franks explained that his primary reason for challenging Pickett was the juror's relationship with the Evanston city council member. Franks said that he felt "left out" during the court's colloquy with Pickett about the friend, and that he did not know what views the political friend espoused. Franks also noted that Pickett's wife was a teacher, and he explained that he rarely accepts jurors who are teachers or who are married to teachers. Finally, Franks observed that Pickett was self-employed as a barber, in addition to his other position, and believed that Pickett would therefore have incurred a loss of income if he had served as a juror in this case.

At the conclusion of the initial *Batson* hearing, the trial judge found the State's challenge to Pickett to be race neutral. The judge stated that the challenge to Pickett was properly based on Pickett's friendship with the attorney, whom the judge characterized as a criminal defense lawyer.

In *Harris I*, this court rejected the trial judge's finding with regard to prospective juror Pickett. The court

observed that the prosecution had not cited the friend's employment as an attorney as a reason for excluding the juror; the court further noted that there was no showing in the record of the attorney's particular fields of practice. *Harris*, 129 Ill. 2d at 184-85.

At the subsequent proceeding on remand from *Harris I*, the trial judge reconsidered the State's explanation for its removal of Pickett and again found it to be race neutral. The judge focused on Pickett's friendship with the Evanston city council member, whom the judge referred to as a "political person," and found that association to be sufficient grounds for a peremptory challenge.

Before this court, the defendant contends that we may not properly consider the prosecutor's lack of knowledge of details regarding a prospective juror as an appropriate reason for challenging the juror. The defendant contends that lack of knowledge will always be an easy pretext to give, and he notes that the State made no attempt during *voir dire* to learn any information about the city council member or about the friendship between him and Pickett. The defendant further contends that we may not consider here the two other reasons cited by the prosecutor for the removal of Pickett because the trial judge did not refer to them in his ruling on the *Batson* issue.

We have carefully reviewed the transcript of the *voir dire*, as well as the transcripts of the original *Batson* hearing and the hearing on remand from *Harris I*. We do not believe that the trial judge's ruling with respect to Pickett was clearly erroneous.

Under *Batson*, once a defendant succeeds in establishing a *prima facie* case of purposeful discrimination, the burden shifts to the prosecution to articulate a clear and reasonably specific explanation for the exercise of its peremptory challenges to members of the excluded

group. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) A neutral explanation sufficient to satisfy this requirement is one based on a reason other than race. (*Hernandez v. New York* (1991), 500 U.S. 352, 360, 114 L. Ed. 2d 395, 406, 111 S. Ct. 1859, 1866.) To be sufficient, however, an explanation for the removal of a juror need not amount to a challenge for cause. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Thus, whether the prosecution acted with discriminatory intent in the exclusion of a prospective juror is a question of fact, turning largely on the credibility of the person supplying the explanation (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21), and a trial judge's ruling will not be reversed unless it is clearly erroneous (*Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871; *People v. Andrews* (1993), 155 Ill. 2d 286, 293-94).

Applying these principles to the case at bar, we are satisfied that the trial judge's determination that the State provided a race-neutral explanation for its decision to exercise a peremptory challenge against Milton Pickett is not clearly erroneous. The prosecutor explained that one of his concerns was that he did not have more information about Pickett's friendship with the council member, or about his political views.

Contrary to the defendant's argument, there is no requirement that a court reject a prosecutor's explanation simply because it rests in part on a lack of knowledge. As we have stated, determining whether the State has properly provided a race-neutral explanation for the exclusion of a particular juror will primarily be a question of credibility; although a prosecutor's complaint that he lacks information regarding a juror might warrant extra caution on the part of the trial judge and reviewing court, it is not automatically invalid. Our earlier opinion in this case counseled that an explana-

tion based on a lack of knowledge deserves close scrutiny, yet the court did not suggest that such an explanation may never stand. (See *Harris*, 129 Ill. 2d at 188.) Although inquiry by the State could have clarified some of the matters left uncertain by the *voir dire*, we cannot say that the failure of the prosecution to propose additional questions regarding Pickett's friend fatally undermines its proffered explanation for the challenge to this prospective juror. See *People v. Kitchen* (1994), 159 Ill. 2d 1, 20-21.

In the proceedings on remand, the State provided an explanation for its failure to attempt to learn more information about the prospective jurors during *voir dire*. Although this explanation was given by a person who had not participated in the selection of the jury in this case, we do not agree with the defendant that we are foreclosed for that reason from considering it. The successor prosecutor explained that asking jurors further questions can threaten to taint the entire venire through the disclosure of sensitive information and can unnecessarily lengthen an already long process. We find these concerns to be legitimate.

Further support for the State's decision to exercise a peremptory challenge against Pickett is found in the two additional explanations provided by the prosecution at the original *Batson* hearing. As we have noted, the prosecutor said that he also based the challenge on Pickett's wife's employment as a school teacher and on Pickett's own part-time work as a self-employed barber. The prosecutor explained that he customarily challenged teachers and spouses of teachers, and that he was concerned that Pickett would suffer a loss of income if he were compelled to serve as a juror in this case.

The defendant argues, however, that we are precluded from now considering these additional reasons because the trial judge, on remand from *Harris I*, relied

solely on Pickett's friendship with the Evanston city council member and failed to mention either of the two other grounds originally provided by the prosecutor. The defendant apparently believes that the only legitimate reasons that may now be cited in support of the peremptory challenges exercised in this case are the ones given by the judge on the remand from *Harris I.*

We do not agree with the defendant that the scope of our review in the present matter is so circumscribed. At no time in the original *Batson* hearing or at the hearing on remand from *Harris I* did the trial judge express any disagreement with the additional grounds offered by the State as explanations for its decision to peremptorily challenge Pickett. On remand from *Harris I,* the trial judge quoted the prosecutor's entire explanation for the challenge to Pickett, which included, of course, the two additional reasons cited above; the judge then addressed the question of the juror's friendship with the city council member, and, though the judge mentioned that ground alone in his ruling, he did not reject the State's additional explanations.

Notably, in prior decisions, we have found no automatic error in the failure of a trial judge to make specific findings regarding the explanations made by the prosecution for its peremptory challenges. (See *People v. Fair* (1994), 159 Ill. 2d 51, 76; *People v. Mack* (1989), 128 Ill. 2d 231, 245.) In both of those cases, we noted that the record contained the prosecutor's explanations for the separate challenges made to the minority members of the venire, and, in reviewing in each case the trial judge's findings of no discriminatory intent, we considered the explanations provided by the prosecution.

If our review of a *Batson* claim may proceed in the absence of specific findings by the trial court regarding each challenged strike, we fail to see why, in a case in which the judge does make specific findings, we should

be disabled from considering explanations that were not expressly ruled on by the trial judge. Thus, we do not agree with the defendant that the trial judge's failure to rely on an explanation offered by the State must now prevent this court from considering the same explanation in support of the judge's ruling.

Turning to the two additional grounds cited by the prosecution, we find both explanations to be free of discriminatory intent. Whatever one might say of the prosecutor's view regarding teachers and spouses of teachers as potential jurors, we consider this to be a race-neutral reason for the decision to exclude Pickett. In addition, we note that Pickett worked part-time as a barber, and the prosecution expressed concern that he could suffer a loss of income if he were empaneled as a juror in the case. This, too, is a race-neutral explanation for the juror's exclusion. In sum, we conclude that the trial judge's determination that the prosecutor had provided valid grounds for its challenge to Pickett is not clearly erroneous.

*Essie Taylor.* We turn next to Essie Taylor, the second of the three prospective jurors whose exclusion from the jury is at issue in this appeal. Taylor stated during *voir dire* that she lived on the southeast side of Chicago, near 79th Street. She worked as a licensed practical nurse at a hospital, and she had two children, aged 12 and 15. After high school Taylor had worked at Kresge's while she was receiving her nurse's training. None of her close friends were police officers. Neither Taylor nor any of her close family members had ever been the victim of a crime or had been accused of committing a crime.

At the original *Batson* hearing, the prosecutor explained that he challenged Taylor because he was not sure what Taylor's husband did for a living, because she lived relatively close to the crime scene, and because he

wanted to leave room on the jury for other, more favorable members of the venire. At the conclusion of the hearing, the judge sustained the State's explanation on the ground that Taylor lived near the defendant's residence. In *Harris I*, this court rejected the trial judge's finding as erroneous, noting that the prosecutor, in his explanation for the challenge to Taylor, had made no reference to the location of the defendant's home. (*Harris*, 129 Ill. 2d at 186.) On remand, the trial judge again upheld the State's explanation for its challenge to Taylor, citing all three reasons mentioned by the prosecutor at the earlier hearing.

We do not find the trial judge's finding to be clearly erroneous. We agree with the State that Taylor's failure to provide more complete information regarding her husband's work was a racially neutral reason for choosing to exclude her from the jury. Taylor stated on her juror information card that she was married, yet she did not answer the question whether her spouse worked. In addition, Taylor wrote "self-employed" in response to the question asking her to identify her husband's employer, but she failed to complete a further question that asked her to name his occupation. As the State notes, the motivating force for the challenge was not so much the prosecutor's lack of knowledge of the juror's husband's work as it was the juror's failure to candidly provide that information.

A further reason cited by the State for its decision to exercise a peremptory challenge against Taylor was the relative proximity of her home to the crime scene. During *voir dire*, Taylor stated that she lived on 79th Street; the offenses involved here occurred on 69th Street. From that information, the prosecutor apparently believed that the juror lived but a short distance, perhaps only 10 blocks, from the crime scene.

Before this court, the defendant notes that the scene

of the crime and the juror's home were actually two or three miles apart and were located in separate neighborhoods and community areas of the city. The defendant argues that such a distance is too great to justify the State's exercise of a peremptory challenge against Taylor, especially in the absence of any evidence that the prospective juror was familiar with the crime scene.

Although we agree with the defendant that the prospective juror did not live particularly close to the scene of the crime, we do not believe that the prosecutor's explanation for its challenge to the juror must therefore be rejected. From Taylor's statement at *voir dire* that she lived on 79th Street, the prosecutor apparently concluded that her home was perhaps only 10 blocks from the crime scene. The defendant contends that this explanation is disingenuous, for Taylor's juror information card clearly indicated her address, and anyone familiar with the city would have realized that the distance between her home and the crime scene was much greater than 10 blocks. We note, however, that at the original *Batson* hearing conducted in this case, defense counsel seemingly agreed with the prosecutor's rough approximation, describing the distance between Taylor's home and the scene of the crime as "10 blocks, 20 blocks."

It is reasonably clear that the parties in the proceedings below were focusing exclusively on the 10-block difference between the two numbered streets and were assuming that the crime scene and the juror's house lay on the same north/south axis. Although that assumption was incorrect, it is not necessary that the State establish the empirical truth of the reason it cites in support of a challenge to a juror. (*Harris*, 129 Ill. 2d at 175-80.) It is enough for our purposes here that the prosecutor reasonably believed that circumstance to be true.

As a final basis for the challenge to Taylor, the prosecutor stated that she was excused so that room would remain for the selection of what the State regarded as more favorable jurors. The trial judge agreed with the State that this was a race-neutral explanation, though the judge noted the difficulty in reconstructing the course of the *voir dire* to determine when the specific challenge was made and what potential jurors remained for consideration at that time. We do not believe that this additional reason is clearly pretextual, and, because the State's challenge to Taylor may be sustained on the two preceding grounds we have discussed, we need not consider it further. See *People v. Andrews* (1993), 155 Ill. 2d 286, 294; *Harris*, 129 Ill. 2d at 176-78.

*Betty Simmons.* Finally, we consider the third prospective juror at issue here, Betty Simmons. During *voir dire*, Simmons stated that she had worked as a clerk for the telephone company for 25 years, that she was a high school graduate, and that her husband was unemployed, having previously worked as a warehouseman, dockman, and janitor. Simmons had two children, aged 23 and 14; her older child, a son, had been held up two years earlier and had gone to court in connection with that case. Simmons also stated that someone had taken $10 and her charge cards from her shopping bag three or four years earlier. Simmons said that neither event would interfere with her ability to be a fair juror.

At the original *Batson* hearing, the assistant State's Attorney who had taken part in selecting the jury in this case explained his reasons for challenging prospective juror Simmons:

"Betty Simmons. Her husband was unemployed. She indicated that her son had gone to court on an armed robbery. Wasn't clear to me from her responses what the disposition of that armed robbery case had been, nor whether she was satisfied with the treatment that her son had received.

Again, I did not feel that I had a great amount of knowledge regarding Betty Simmons. Her ties to the community seemed to be tenuous, and in comparison to other jurors I was considering at that time, I did exercise a peremptory challenge."

At the conclusion of the *Batson* hearing, the trial judge inadvertently failed to make a finding regarding the State's exclusion of Simmons. On remand from this court's opinion in *Harris I* (see *Harris*, 129 Ill. 2d at 187-88), the judge found no discriminatory intent in the State's decision to remove Simmons from the jury. The judge disagreed with the prosecutor's view that Simmons had only tenuous ties to the community, noting her education and long-term employment in Chicago, but sustained the challenge on other grounds cited by the prosecutor.

The trial judge believed that the four white persons selected as the jury's second panel, at the same time Simmons was excused from service, possessed a number of characteristics that would appeal to the prosecution. Richard Gray, who became the jury foreman, was a college graduate and had a master's degree in business; he worked as a financial analyst for the State of Indiana. Michael Dolan had been employed as a truck driver for 13 years. Lois Gregg was a dental assistant; she had three children in their thirties, and her husband taught at a university in the Chicago area. Finally, Helen Karwowski was retired; her husband had been a pharmacist and had owned his own drugstore. Karwowski had worked at the drugstore and also as an employment counsellor, and she had raised four children. The judge described this panel of four as a "prosecutor's dream." Comparing Simmons with these jurors, the judge stated:

"Again, it appears that the State's Attorney was attempting to gain a certain kind of 'educated,' 'older,' 'conservative,' or 'stable' juror. Gray was highly educated; Karwowski and Gregg were older; Dolan had been a truck

driver for thirteen years. Simmons was a clerk at a telephone company. Her husband—unemployed at the time—was, as she put it, a 'warehouseman, dockman and janitor. In that line of work.' "

Our cases have held that the unemployment of a prospective juror may be a legitimate, race-neutral reason for the exercise of a peremptory challenge. (*People v. Kitchen* (1994), 159 Ill. 2d 1, 22; *People v. Hudson* (1993), 157 Ill. 2d 401, 432; *People v. Andrews* (1993), 155 Ill. 2d 286, 301-02; *People v. Mack* (1989), 128 Ill. 2d 231, 241.) The defendant argues, however, that the unemployment of a prospective juror's spouse should generally be considered irrelevant to jury service, unless the prospective juror indicates to the contrary. (See *People v. Powell* (1991), 224 Ill. App. 3d 127, 133-35.) Without answering that question here, we believe that the unemployment of a prospective juror's spouse is a valid concern and may be considered by the prosecutor, at least in combination with other circumstances, in determining whether to exercise a peremptory challenge against a prospective juror.

In selecting a jury in this case, the prosecution was motivated in part by the desire to obtain as jurors persons who were relatively well educated or prosperous. As the trial judge observed in sustaining the State's removal of Betty Simmons, "Whether these sort[s] of distinctions are valid or not, is not the question. Difference[s] in employment, age and status are part of the sparse data given to trial lawyers upon which to make decisions." The trial judge accurately noted that the families of the four persons who were selected as jurors at the time Betty Simmons was excused possessed more education or better employment than did she or her family. Although it is not clear from the record whether the State was required to challenge Simmons to obtain what the trial judge described as the "dream" panel of jurors, we do not believe that the distinctions mentioned

by the prosecutor and the trial judge were pretextual or contrived.

At the hearing on remand from *Harris I*, the trial judge also found acceptable another reason cited by the State in explanation for its peremptory challenge to Betty Simmons: uncertainty over the disposition of the case involving her son. We need not determine here whether this explanation, standing alone, would be sufficient under *Batson*. We decline, however, to reject it as merely pretextual, as the defendant urges us to do. A family member's prior experiences as a crime victim may be a legitimate concern of the prosecution in deciding whether to accept or reject a particular member of the venire.

The trial judge carefully considered the evidence before him and concluded that the prosecutor's explanation for the exclusion of Betty Simmons was nondiscriminatory. As we have noted, this determination is one largely of credibility. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." (*Hernandez v. New York* (1991), 500 U.S. 352, 365, 114 L. Ed. 2d 395, 409, 111 S. Ct. 1859, 1869.) In the present case, the trial judge credited the statement of the prosecutor who took part in the selection of the defendant's jury, finding believable the prosecutor's rationale for choosing to remove Simmons from the jury. We are unable to conclude on this record that the judge's evaluation of the pertinent evidence was clearly erroneous.

In a further contention related to the selection of the jury in this case, the defendant argues that the cause must be remanded once again, so that the State may

now explain why it exercised a peremptory challenge against a Hispanic member of the venire. The defendant, who is black, notes that under current law he may challenge the exclusion of persons who do not share his racial or ethnic identification (see *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364), and he notes that he has preserved this objection throughout the proceedings.

The defendant is correct in observing that the rule announced in *Powers* would apply to the present case, for this matter was pending on direct review at the time *Powers* was decided. See *People v. Pasch* (1992), 152 Ill. 2d 133, 162 ("While *Powers* was decided after defendant was tried, it is still applicable to this case for the same reasons that *Batson* was applied retroactively to cases pending on direct appeal at the time *Batson* was decided").

In support of this contention, the defendant argues that there is no need to establish a separate *prima facie* case with respect to each additional excluded ethnic group, once a *prima facie* case has been shown with regard to at least one group. In essence, the defendant believes that the *prima facie* case of purposeful discrimination he established with regard to the exclusion of black members of the venire may extend to the State's exclusion of Hispanic members of the venire as well. The defendant therefore asks that the State be compelled to provide a neutral explanation regarding the exclusion of the one Hispanic member of the venire.

As an initial matter, we do not agree with the defendant's premise that establishing a *prima facie* case of discrimination with respect to one racial or ethnic group automatically serves to establish a *prima facie* case with respect to other groups as well. In the present case, the trial court concluded that the defendant established a *prima facie* case of purposeful discrimina-

tion based on the number of peremptory challenges exercised by the State to black members of the venire, a determination that this court upheld in *Harris I*. (*Harris*, 129 Ill. 2d at 171-72.) The focus in *Batson* and its progeny has been on the exclusion of the members of a single, identifiable group, not of different groups considered together. Indeed, broadening the *Batson* inquiry to include multiple ethnic groups as part of a single claim of discrimination would seemingly make the establishment of a *prima facie* case more difficult than it is now. For these reasons, we decline here to expand the *Batson* rule to embrace the simultaneous consideration of different racial or ethnic groups. See *People v. McDonald* (1993), 249 Ill. App. 3d 702 (giving separate consideration to questions whether prosecution discriminated against blacks and Hispanics in selection of defendant's jury); *cf. People v. Washington* (1993), 257 Ill. App. 3d 26, 34 (*Batson* not applicable to combined race-sex discrimination).

Accordingly, we do not believe that the present matter must necessarily be remanded for further proceedings. As we did in *People v. Pasch* (1992), 152 Ill. 2d 133, we consider here whether the defendant has succeeded in establishing a *prima facie* case of discrimination with respect to the Hispanic member of the venire. In making this inquiry, we note the apparent presence of only one Hispanic in the venire. The defendant was of a different ethnic group, and there would have been no likely reason for the prosecutor to have attempted to discriminate against Hispanics. Moreover, the defendant has made no attempt to compare the qualifications or characteristics of the excluded Hispanic venire member with those of jurors retained by the State. (See *Pasch*, 152 Ill. 2d at 221 (Miller, C.J., concurring).) On this record, we find no circumstances that would raise a *prima facie* inference of discrimination on the part of the prosecutor. See *Pasch*, 152 Ill. 2d at 163-65.

## II

Following this court's decision in *Harris I*, a new sentencing hearing was conducted. At the hearing, the defendant waived his right to a jury. The State again sought to base the defendant's eligibility for the death penalty on the murder-in-course-of-felony aggravating circumstance found in section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)). At the hearing, Theresa Woods testified, providing testimony largely consistent with the testimony she had given at the defendant's trial a number of years earlier. The defendant introduced, as impeachment, evidence of statements made by Woods to police shortly after the occurrence involved here. In those statements, Woods described a somewhat different sequence of events. She said that when she left the tavern with the money, she noticed that the car was moving, that James and the defendant were struggling, and that the car then crashed into the nearby storefront. The defendant argued that the shooting might have been accidental, occurring as part of the struggle in the moving car. At the conclusion of the first stage of the hearing, the judge found the defendant eligible for the death penalty.

The matter then proceeded to a consideration of evidence in aggravation and mitigation. The State presented evidence regarding the defendant's criminal record, which included convictions for theft, armed robbery, burglary, and robbery. In mitigation, the defendant presented favorable testimony from a number of family members. In addition, several correctional officers, who were familiar with the defendant's conduct as a prisoner, provided favorable testimony. Other mitigation witnesses, including the director of an organization opposing the death penalty, testified in the defendant's favor. These witnesses stated that the defendant was a cooperative inmate, and they described his artistic ability. The defendant also testified at the sentencing hearing, and

he denied having been involved in the present offenses. At the conclusion of the hearing, the judge determined that there were no mitigating circumstances sufficient to preclude imposition of the death penalty and accordingly sentenced the defendant to death.

In the present appeal, the defendant raises several challenges to the sentencing proceedings. The defendant first argues that the sentencing judge at the second hearing should not have found him eligible for the death penalty without having first determined that he acted with intent or knowledge in shooting the murder victim. As the defendant notes, such a finding is required by section 9—1(b)(6) of the Criminal Code (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)). Notwithstanding the absence of this finding, we do not agree with the defendant that the eligibility determination is infirm.

At the conclusion of the first stage of the hearing, the sentencing judge stated:

"Based upon the evidence which the court has heard, it has been established that the defendant was born on March 30, 1953; that he was then clearly of an age of eighteen or older when the offense occurred; that the murder conviction also resulted in convictions for the offense of attempt armed robbery, and that is one of the qualifying factors for the imposition of the death penalty, and that the murder was committed during the course of the attempt armed robbery.

Therefore, the court does find that the evidence has established that the defendant is eligible for the imposition of the death penalty.

Further, there has been no dispute in the evidence that has been indicated by the State's attorney that the defendant is the person who actually fired the fatal shot that killed the decedent, a Mr. James, in that he acted alone; and, therefore, there is no question of an accountability situation.

The court's finding of eligibility will stand."

The defendant now contends that the eligibility determination is deficient because the sentencing judge

did not expressly find that the defendant acted with either intent or knowledge in causing the victim's death. Relying on *People v. Ramey* (1992), 151 Ill. 2d 498, the defendant maintains that the death sentence must be vacated.

We find *Ramey* to be distinguishable, and we do not agree with the defendant that a new sentencing hearing is necessary in the present case. As it did in the present case, the State sought to base Ramey's eligibility for the death penalty on the murder-in-course-of-felony aggravating circumstance provided by section 9—1(b)(6). The hearing in that case was conducted before a jury, and the jury instructions used in that case failed to require the jury to find that the defendant acted with intent or knowledge in causing the death of the victim. This court vacated the defendant's death sentence, concluding that the omission from the jury instructions of the intent or knowledge element was fatal to the eligibility determination and that the necessary finding could not be provided on review, whether by implication from the same jury's other findings in the proceedings, or by this court's own analysis of the evidence against the defendant.

The present case is different from *Ramey* in several significant respects. First, the judge in the present case had before him the determination made at the original sentencing hearing and specifically stated that it "could stand." This prior determination included express findings by the judge at the original hearing, a different judge, that the defendant acted with intent or knowledge in performing the acts that caused the victim's death. We thus construe the present sentencing judge's comments as indicating that he meant to adopt the prior judge's sentencing determination as his own. In addition, we note that the sentencing judge at the second hearing commented that the defendant's murder of

James was "totally unnecessary," suggesting that the judge did not agree with the defendant's accident theory.

A second ground distinguishing the present case from *Ramey* is related to the first: the present eligibility determination was made by the judge rather than by a jury. Thus, supplying that finding now, as we do, does not deny the defendant a determination of the issue by the jury hearing the matter, as the *Ramey* court had concluded.

In a related contention, the defendant argues that he was denied the effective assistance of counsel by his attorney's failure to present, at the first stage of the new sentencing hearing, substantive evidence contradicting Woods' description of the shooting of James. This evidence consisted of testimony from a police officer who had questioned Woods in the hospital shortly after the occurrence here. According to this witness, Woods said that when she emerged from the tavern with the money she saw the defendant and James struggling in the car, which was moving, and that the car then struck the window of the nearby storefront. This testimony was introduced at the sentencing hearing as impeachment. The defendant now contends that defense counsel was ineffective for having failed to offer it as substantive evidence under the excited utterance exception to the hearsay rule. See *People v. Smith* (1992), 152 Ill. 2d 229, 258-61; *People v. House* (1990), 141 Ill. 2d 323, 381-86; *People v. Nevitt* (1990), 135 Ill. 2d 423, 443-46.

To establish ineffective assistance of counsel, a defendant must show both a deficiency in counsel's performance and prejudice resulting from the deficiency. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) In the present case, the defendant contends that defense counsel was deficient because the evidence was not presented for

substantive use, and that the defendant was prejudiced because the evidence would have justified the sentencing judge in concluding that the defendant did not possess the requisite intent when the victim was shot.

A defendant's failure to establish prejudice under *Strickland* is fatal to an allegation of ineffective assistance of counsel; if no prejudice ensued, a claim may therefore be disposed of on that ground alone, without considering the separate question whether counsel was deficient. (*Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) We do not believe that the defendant has made the requisite showing here.

Even if the evidence of Woods' prior statements had been introduced for substantive use, we do not believe that the sentencer—here, the judge—would have likely accepted the defendant's accident theory. As the prosecutor explained at the sentencing hearing, the more reasonable inference from the description of the offenses provided by Woods to police was that James was shot while the car was in gear, and that the vehicle rolled forward when the driver lost control. Other evidence established that the shooting was not accidental. The defendant initially threatened to kill James and Woods because, he said, he had "nothing to lose." When Woods reentered the tavern to obtain money, the defendant said that he would kill James if she did not return shortly. When Woods came back to the car, the defendant rejected James' plea that Woods be allowed to go, saying that he was "running this." After James was shot, the defendant straddled Woods, said to her, "You bitch," and shot her at close range. On this record, we do not believe that the defendant has shown that he was prejudiced by counsel's failure to seek the substantive use of Woods' prior statements.

### III

In a final series of arguments, the defendant chal-

lenges the facial validity of the Illinois death penalty statute (Ill. Rev. Stat. 1981, ch. 38, par. 9—1), contending that various aspects of the statutory scheme violate the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV). As explained below, we have rejected identical arguments in other cases, and we find no reason to depart from those precedents.

The defendant contends first that the statute places a burden on the defense that effectively bars the sentencer from giving meaningful consideration to evidence in mitigation. The defendant bases this argument on the provision in the statute that directs the sentencing authority—judge or jury, as the case may be—to impose the death penalty if the sentencer "determines that there are no mitigating factors sufficient to preclude the imposition of" that sentence. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(g), (h).) Seizing on the phrase "sufficient to preclude," the defendant maintains that the statutory language effectively required him to negate, or contradict, the sentencing judge's earlier determination that the defendant was in fact eligible for the death penalty. We do not agree. We have repeatedly rejected the argument that this provision of the statute is self-contradictory, finding that it rests on a strained interpretation of the statute (*People v. Strickland* (1992), 154 Ill. 2d 489, 538-39; *People v. Mitchell* (1992), 152 Ill. 2d 274, 345-46; *People v. Hampton* (1992), 149 Ill. 2d 71, 115-17), and we continue to adhere to that view.

Finally, the defendant contends that a number of features of the Illinois death penalty statute, in combination, enhance the risk that the sentence might be imposed in an arbitrary and capricious manner. As noted below, we have previously denied challenges to these aspects of the statute, and we find no reason here to conclude that these features, whether viewed singly or in combination, threaten to undermine the validity of

the sentencing scheme. Our court has held that the statute is not invalid for affording the prosecutor discretion in determining whether to seek the death penalty in a particular case. (*People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43; see also *Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986, 993-94.) Our case law has also established that the statute is not invalid for failing to require the prosecution to provide the accused with pretrial notice of the State's intent to seek the death penalty (*People v. Silagy* (1984), 101 Ill. 2d 147, 161-62; *People v. Gaines* (1981), 88 Ill. 2d 342, 369) or pretrial notice of the aggravating evidence to be introduced at the sentencing hearing (*People v. King* (1986), 109 Ill. 2d 514, 547; *People v. Albanese* (1984), 104 Ill. 2d 504, 540; *Gaines*, 88 Ill. 2d at 369).

Moreover, comparative proportionality review is not required by the Federal Constitution (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871), and the Illinois statute is not invalid for its failure to mandate such review (*King*, 109 Ill. 2d at 551; *People v. Stewart* (1984), 104 Ill. 2d 463, 499; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44). Further, the statute is not unconstitutional for failing to impose on the State a burden of persuasion at the aggravation/mitigation stage of the sentencing hearing (*People v. Jones* (1988), 123 Ill. 2d 387, 426; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 68; *People v. Free* (1983), 94 Ill. 2d 378, 421), nor does the statute unconstitutionally impose on the defense a burden of establishing that a noncapital sentence should be imposed (*Silagy*, 905 F.2d at 998-99; *People v. Fields* (1990), 135 Ill. 2d 18, 76; *People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Caballero* (1984), 102 Ill. 2d 23, 49). Finally, there is no constitutional requirement that a capital sentencing jury be told the possible prison terms that will be imposed if the defen-

352

dant does not receive the death penalty. *People v. Phillips* (1989), 127 Ill. 2d 499, 543; *People v. Albanese* (1984), 102 Ill. 2d 54, 81.

Given the extensive body of law upholding the preceding aspects of the death penalty statute, we must reject the defendant's contention that the combined effect of these statutory features is to enhance the risk that the sentence will be imposed in an arbitrary and capricious manner. (*People v. Page* (1993), 155 Ill. 2d 232, 284-85; *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 409; *People v. Kokoraleis* (1989), 132 Ill. 2d 235, 292-93.) If the individual aspects of the statute are constitutionally valid, we believe that the whole statute must also be valid. *Phillips*, 127 Ill. 2d at 542-43.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Wednesday, March 15, 1995, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1992)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed.*

JUSTICE HARRISON, dissenting:

In *Harris I,* the court remanded this case to the circuit court with directions to make new findings of fact and conclusions of law with respect to the State's exclusion of venire members Pickett, Taylor and Simmons. This was the second time the court ordered the circuit court to consider defendant's challenge under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, and for the second time defendant's

challenge was rejected. As it did after the first hearing, and based on the same evidence, the circuit court once again concluded that the State had not excluded Pickett, Taylor and Simmons for racially discriminatory reasons. In my view, that conclusion is no more sound now than it was when we issued our last opinion in the case. My colleagues are able to reach the result they do today only by implicitly overruling this court's prior decision. Because I think *Harris I* should still be followed, I dissent.

In *Harris I*, this court noted the importance of carefully scrutinizing claims by the State that it had excluded jurors because it did not know enough about them. Because such explanations "can be easily utilized as a pretext for discriminatory challenges," the court held that trial courts considering such explanations should take into account whether the State made any attempt at discovering the unknown information by, for example, requesting that supplemental questions be asked during *voir dire*. (*Harris*, 129 Ill. 2d at 188.) In its opinion today, the majority abandons that requirement, declaring instead that the State's failure to propose supplemental questions did not render its claim of insufficient knowledge fatally invalid. 164 Ill. 2d at 333-34.

The majority justifies its position by citing testimony given by one of the prosecutors at the second *Batson* hearing. That prosecutor explained that the State avoids asking jurors additional questions because doing so would prolong the jury-selection process. He also stated that

> "[a]nother reason we don't ask questions is, sometimes we are afraid of what the answer might be. The answer might contaminate or irritate the other jurors."

A threshold problem with this rationale is that the prosecutor who advanced it was not involved in the selection of the jury here, and there is absolutely no evidence that these considerations actually played any

role in the State's conduct in this case. The prosecutor who testified merely stated these concerns as general propositions. At no time did he pretend to ascribe them to his predecessors in the case.

An equally fundamental flaw in the State's rationale is that the same arguments could be made about virtually any question tendered during *voir dire*. Every inquiry by the court or the parties lengthens the proceedings, and every question holds the uncertainty of an unexpected response. If we knew what the answers would be and how other jurors would respond to them, there would be no point to *voir dire* at all. As a result, this cannot be regarded as sufficient grounds for overcoming the defendant's *prima facie* case of racial discrimination under *Batson*.

In validating the State's decision to exercise a peremptory challenge against venireperson Pickett, the majority cites two additional justifications advanced by the State, namely, that Pickett's wife was a school teacher and that Pickett might suffer a loss in income from his part-time work as a barber if selected to serve. These justifications must also be rejected, however, because they were not relied upon by the trial judge in making his decision. The majority opines that specific findings by the trial court were not required (164 Ill. 2d at 335), but in *Harris I* this court expressly held otherwise (*Harris*, 129 Ill. 2d at 185). Although the court may now wish to jettison such a requirement, now is not the time to do so. Having ruled as we did, basic concepts of due process require us to remain consistent at least within the confines of the same case.

With respect to the exercise of a peremptory challenge against venireperson Taylor, the additional reasons found by the trial court to be legitimate were that the State's Attorney wanted to leave room for other, more desirable jurors and that Taylor lived close

to the defendant and to where the incident occurred. Contrary to the majority, I believe these justifications must be deemed pretextual. Without reaching the question of whether it is ever legitimate to excuse a minority venireperson on the grounds that the prosecutor is looking for someone with more "desirable" socioeconomic characteristics, I note simply that the record will not support a claim that exclusion of Taylor was necessary to enable the State to accomplish such a goal. As the State itself concedes, it is now impossible to reconstruct the order in which challenges were exercised in the case.

As for the issue of proximity, this is a factor which must be viewed with particular skepticism in the context of peremptory challenges. Given the incidence of black-on-black crime, and the geographical segregation of minority groups that still characterizes urban areas such as Chicago, "proximity to the crime scene" can be a ready subterfuge for excluding African-American jurors. While consideration of this factor will not always be improper, the State fails to explain how it is relevant under the facts of this case. As it turns out Taylor did not live anywhere near the crime scene, but even if the prosecutor mistakenly thought she did, it is of no consequence. There is absolutely nothing to suggest that Taylor had any personal knowledge of the crime, the participants, or the neighborhood, nor did she give any indication that these or any other factors would affect her ability to serve on the jury.

As for venireperson Simmons, the circuit court found that the State had established two legitimate alternative reasons for excluding her. First, as in the case of venireperson Taylor, the State claimed that it wanted to seat other, more desirable jurors. As with Taylor, however, the State cannot establish that it needed to eliminate Simmons in order to make room for

the additional jurors who were allegedly superior. I note, moreover, that the particular jurors cited by the trial court were not uniformly superior to Simmons under the criteria identified. They were not all older, they were not all better educated, and they had not all been in their jobs longer than Simmons.

The second alternative reason given was that Simmons' husband was unemployed. The unemployment of a prospective juror's spouse is not sufficient, standing alone, to rebut a defendant's *prima facie* case of race discrimination. (See *People v. Powell* (1991), 224 Ill. App. 3d 127, 134.) Because the other justifications advanced here were pretextual, this reason is therefore insufficient to save the State's case.

For the foregoing reasons, I would hold that defendant was denied his right to equal protection under the fourteenth amendment because the State engaged in purposeful discrimination against him in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. The judgment of the circuit court should be reversed, and this cause should be remanded for a new trial.