## In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-1434

JAMES HARRIS,

*Petitioner-Appellant*,

*v.*

MARCUS HARDY, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cv-01578—**William T. Hart**, *Judge.*

ARGUED OCTOBER 25, 2010—DECIDED MAY 23, 2012

Before WOOD, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* In 1984 James Harris was convicted of murder, attempted murder, aggravated battery, and attempted armed robbery. He was sentenced to death on the murder conviction and to terms of imprisonment on the other crimes. His sentence later was commuted to life imprisonment by Illinois Governor George Ryan. Harris asks us to review the district court's decision denying his petition for habeas corpus.

He raises three grounds for relief. He first contends that the State exercised peremptory challenges based on race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Next he contends that defense counsel rendered ineffective assistance of counsel in failing to establish at the *Batson* hearing the race of two venirepersons on whom the State exercised peremptory strikes. Finally, he asserts that the State failed to disclose impeachment evidence at his second sentencing hearing in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Because it was unreasonable for the state courts to credit the prosecutor's proffered reasons for several peremptory challenges, we conclude that the petition should be granted.

## I. Background

In April 1984, a Cook County, Illinois, jury convicted petitioner Harris of the murder of Jesse James, Sr., the owner of a tavern on Chicago's south side, and the attempted murder of Theresa Woods, who worked as a waitress at the tavern. The jury also convicted Harris of aggravated battery and two counts of attempted robbery arising out of the same incident.

The jury selection took place over the course of two days. We will explain the process in general and then discuss the particulars of the peremptory strikes that are at issue in this case. The court used a variation of the "jury box" system for jury selection, *see, e.g.*, Roger Allan Ford, *Modeling the Effects of Peremptory Challenges on Jury Selection and Jury Verdicts*, 17 Geo. Mason L. Rev. 377, 383-87 (2010), and the parties do not contend that the

process was inconsistent with the Illinois criminal trial court rules regarding *voir dire* and jury selection. *See* ILCS S. Ct. Rule 431 (1971); ILCS S. Ct. Rule 434 (1982). Of course, the number of jurors that ultimately would be seated was twelve, not including alternates.

As it was explained in the record in the trial court, the process worked this way: the prospective jurors would be seated in the jury box in a series of groups, beginning with a group of twelve to fourteen prospective jurors who were seated in the order in which their names were randomly drawn by the clerk of the court. The judge would individually question the venirepersons in the first group; he would then consider requests for excuse from service by jurors as well as challenges for cause and peremptory strikes exercised by the lawyers for the prosecution and defense directed at the individuals in that group. If four of the venirepersons from that group were not excused or struck (for cause or peremptorily), they then would be sworn as jurors. It might be useful to think of that group of four as a "mini-panel," with the objective being to select three such groups to reach the goal of having twelve jurors. Alternatively, the first round of questioning and striking could result in fewer or more than four prospective jurors "surviving" the striking. If the number was less than four, those names would be set aside temporarily while another round of questioning of a fresh batch of venirepersons was conducted by the judge. Next, counsel and the judge would return to the judge's office to challenge and strike from the fresh batch. Any of the prospective jurors who had been

carried over from the preceding batch, but who had not yet been sworn as a juror, could also be eliminated by a party exercising a peremptory challenge against that venireperson. (This is sometimes referred to as "backstriking.") When this second round of challenging and striking of a batch was completed, the names of the prospective jurors who "survived" that second striking round would still be under consideration. However, when those names totaled four, a "mini-panel" would then be sworn. The opportunity to "backstrike" a prospective juror ended as soon as that person was sworn and became one of the four members of a "mini-panel." What would happen if the number of prospective jurors "surviving" the challenges and strikes of the first round exceeded four, or if the combination of those carried over from the first round, when added to those "surviving" the second round exceeded four? In that event, the first four (in the order of the random draw) of those "surviving" jurors would be sworn as a "mini-panel," the additional names (assuming the number was less than four) would be carried over, and a new round of questioning of a fresh batch of prospective jurors would be undertaken. This process would continue until three of the "mini-panels" were constituted. Six rounds of questioning took place in this case over the two days of jury selection.

The judge excused two jurors for cause during questioning. Otherwise, after the judge completed his questioning of a batch of jurors, counsel and the judge retired to the judge's office for the raising of other challenges for cause and the exercise of peremptory strikes. The

judge excused two others for cause or hardship following a discussion with the attorneys. The jury cards were put in the order that the venirepersons were seated in the jury box and the parties, by exercising peremptory strikes, selected the four jurors that would comprise the first "mini-panel." This process was repeated to select the second and third "mini-panels." Throughout the course of six striking sessions, both sides used all 20 of their peremptory challenges. The State exercised 17 of its peremptory strikes on African Americans. Two African Americans, Robbie Abbott and Percy Chambers, served on the jury. Both were chosen for the first "mini-panel" of four when the prosecution still had most of its peremptory strikes. One African American served as an alternate juror.

Following trial, Harris was sentenced to death on the murder conviction and terms of imprisonment on the other crimes. On direct appeal to the Illinois Supreme Court, Harris challenged his convictions on several grounds. Among them, he argued that the State's use of peremptory challenges to exclude African Americans from the jury denied him a fair trial. While his appeal was pending, the Supreme Court decided *Batson v. Kentucky*, 476 U.S. 79 (1986), and held that *Batson* applied retroactively to all cases on direct review. Thereafter, the Illinois Supreme Court issued a supervisory order, retaining jurisdiction and remanding for a *Batson* hearing.

In July 1987, the judge who had presided over Harris's jury trial held a *Batson* hearing at which an Assistant State's Attorney (the "ASA") who had participated in

jury selection testified about the State's reasons for striking certain jurors. The trial court found that because the State exercised 17 of its 20 peremptory challenges on African Americans, Harris established a prima facie case of discrimination. The trial court accepted the State's proffered race-neutral reasons for the strikes, stating: "[the ASA] was extremely candid throughout the proceedings, and I believed his explanations throughout." Thus, the trial court found that the State used its peremptory challenges on African Americans for non-racial reasons and it rejected Harris's *Batson* claim.

The case returned to the Illinois Supreme Court where Harris renewed his previous arguments and further argued that the trial court erred in rejecting his *Batson* claim. The court vacated the death sentence and conditionally vacated the convictions and other sentences subject to reinstatement. *People v. Harris*, 544 N.E.2d 357 (Ill. 1989) ("*Harris I*"). The court concluded that in deciding whether Harris made a prima facie case of discrimination, the trial court erred in considering two venirepersons, Christine Riley and Edward Shealy, whose race was disputed. *Id.* at 378-79. The court, however, agreed that Harris had established a prima facie case of discrimination and that the State rebutted the prima facie case for 12 of the 15 African American venirepersons. *Id.* at 379-87. The court reversed the trial court's finding that the State rebutted the prima facie case as to 3 venirepersons, Milton Pickett, Essie Taylor, and Betty Simmons, and remanded the case to the trial court for new findings and conclusions regarding the State's explanations for striking them. *Id.* at 383-86.

On remand the trial court found no *Batson* violation. It conducted a second sentencing, once again imposing the death penalty. Harris appealed to the Illinois Supreme Court, challenging the *Batson* ruling and his sentence. That court affirmed, concluding that the trial court's determination that the State provided race-neutral reasons for exercising peremptory challenges against Pickett, Taylor, and Simmons was not clearly erroneous. *People v. Harris*, 647 N.E.2d 893, 899-903 (Ill. 1994) ("*Harris II*"). One justice dissented, concluding that the State excluded these 3 venirepersons because of their race. *Id.* at 908-10 (Harrison, J., dissenting).

Harris filed a postconviction petition, raising an ineffective-assistance-of-counsel claim related to his counsel's failure to establish at the *Batson* hearing the race of Riley and Shealy. Harris also claimed that he was denied due process in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), based on the State's nondisclosure of medical records that would have impeached a witness who testified to aggravation evidence at his second sentencing hearing. The circuit court dismissed his petition without an evidentiary hearing. Harris appealed directly to the Illinois Supreme Court, which affirmed in part and reversed in part, remanding for an evidentiary hearing with respect to the *Brady* claim. *People v. Harris*, 794 N.E.2d 314 (Ill. 2002) ("*Harris III*"). The court rejected the *Batson* claim as to Riley (referred to in the opinion as Brown) and Shealy, finding no error in the trial court's determination that the prosecutor's explanations for excluding them were legitimate and race-neutral. *Id.* at 327-30. It specifically noted that at the conclusion of

the *Batson* hearing, the trial court found "the challenges were used for neutral reasons[,] not for racial ones." *Id.* at 327 (alteration in original). Harris's death sentence subsequently was commuted to natural life without parole by Governor Ryan, and the trial court dismissed his petition as moot without an evidentiary hearing. Harris appealed to the Illinois Appellate Court, which affirmed, and the Illinois Supreme Court denied review. *People v. Harris*, 849 N.E.2d 334 (Ill. 2006).

Harris sought habeas relief under 28 U.S.C. § 2254, raising his *Batson* claim, an ineffective-assistance-of-counsel claim aimed at his *Batson*-hearing counsel's failure to establish the race of Riley and Shealy, and his *Brady* claim. The district court ordered discovery on the *Brady* claim but ultimately denied all relief. Harris sought a certificate of appealability and the district court issued a certificate as to all claims.

## II. Analysis

We review the district court's denial of a habeas petition de novo. *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir.), *cert. denied*, 131 S. Ct. 578 (2010). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we deferentially review the decision of the last state court to address Harris's claims on the merits. *See id.* A federal court may not grant habeas relief unless the state court's adjudication of a claim "'was contrary to, or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court

of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented.'" *Id.* (quoting 28 U.S.C. § 2254(d)). Under the "unreasonable application" of law clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). This means that the state court's application of law must have been "objectively unreasonable." *Id.* at 409.

Harris claims that the prosecutors violated his equal protection rights and *Batson v. Kentucky*, 476 U.S. 79 (1986), by using peremptory strikes to exclude African American venirepersons from the jury. He contends that the state courts' rejection of his *Batson* claim was based on an unreasonable determination of the facts in light of the evidence presented. Harris specifically challenges the State's peremptory strikes of seven African Americans: Lucille Woodard, Wilbert Stearn, Milton Pickett, Essie Taylor, Betty Simmons, Emma Alexander, and Lisa Lucas. He also challenges the State's strikes of Christine Riley and Edward Shealy, but in the context of his ineffective-assistance-of-*Batson* counsel claim. He asserts that had *Batson*-counsel established their race, there is a reasonable probability that the state court would have found that the prosecutor engaged in purposeful

discrimination in jury selection.[1] In reviewing Harris's *Batson* claim, we keep in mind that the exclusion of even one venireperson because of race violates the Equal Protection Clause. *See Snyder v. Louisiana*, 552 U.S. 472, 478 (2008).

*Batson* claims are evaluated under a now familiar three-step inquiry. First, the opponent of a peremptory challenge must make out a prima facie showing of race discrimination in selection of the venire. If this showing is made, the burden of production shifts to the proponent of the strike to offer a race-neutral explanation. Then the court must determine whether the opponent of the strike has proved purposeful discrimination. *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (per curiam); *Batson*, 476 U.S. at 96-98. At the second step, the explanation need not be "persuasive, or even plausible"; the issue is whether the explanation is non-discriminatory. *Purkett*, 514 U.S. at 767-68. The persuasiveness of the justification becomes relevant at the third step, in which the court weighs the evidence and determines whether the race-neutral explanation is credible or a pretext for purposeful discrimination. *Id.* at 768; *see also United States v. Rutledge*, 648 F.3d 555, 556-57 (7th Cir. 2011) (stating that

---

[1] When reviewing the *Batson* claim, the Illinois Supreme Court initially declined to consider the strikes of Riley and Shealy. *Harris I*, 544 N.E.2d at 378-79. Later, when reviewing the ineffective-assistance-of-*Batson*-counsel claim, the court concluded that the *Batson* claim was meritless as to them. *Harris III*, 794 N.E.2d at 326-30.

*Batson*'s third step "requires the [trial] court to make a finding of fact regarding the prosecutor's credibility after the prosecutor has offered a race-neutral reason for the strike").

Credibility can be evaluated based on many factors, including "the [proponent's] demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) ("*Miller-El I*"); *see also Hernandez v. New York*, 500 U.S. 352, 365 (1991) (stating that "the best evidence" of discriminatory intent "often will be the demeanor of the attorney who exercises the challenge"). Credibility can also be determined "by considering the offering party's consistency in applying its non-discriminatory justification." *United States v. Stephens*, 514 F.3d 703, 711 (7th Cir. 2008). "[I]f a [party's] proffered reason for striking [a prospective juror of one race] applies just as well to an otherwise-similar [juror of a different race] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("*Miller-El II*"); *see also United States v. Taylor,* 636 F.3d 901, 905 (7th Cir. 2011) (quoting *Miller-El II*). "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

An opponent of a strike "may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination." *Miller-El II*, 545 U.S. at 240 (quoting *Batson*,

476 U.S. at 96-97). A pattern of strikes against members of a particular race may give rise to an inference of discrimination. *Batson*, 476 U.S. at 97; *Miller-El II*, 545 U.S. at 240-41 (characterizing the prosecutors' use of peremptory strikes as "remarkable" where 9 African Americans were excused for cause or by agreement and the prosecutors peremptorily struck 10 African Americans); *Miller-El I*, 537 U.S. at 331 (prosecutors used 10 of their 14 peremptory strikes against African Americans and only 20 of the 108 possible jurors under consideration were African American). "Such a pattern can be evident where a prosecutor uses peremptory challenges to eliminate all, or nearly all, members of a particular race." *United States v. Stephens*, 421 F.3d 503, 512 (7th Cir. 2005) (analyzing strikes at *Batson*'s first step). Courts also have "considered whether a disproportionate number of peremptory challenges were exercised to exclude members of a particular cognizable group." *Id.*

On direct review of a *Batson* claim, a trial court's factual findings on the question of discriminatory intent, which largely turn "on evaluation of credibility," *Batson*, 476 U.S. at 98 n.21, are entitled to "great deference," *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (per curiam) (quoting *Batson*). "Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Miller-El I*, 537 U.S. at 339. On federal habeas review, however, the standard is even more demanding. *Id.* at 339-40; *see also Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam). We cannot "second-guess the reasonable decisions of state courts." *Renico v.*

*Lett*, 559 U.S. \_\_\_, 130 S. Ct. 1855, 1866 (2010). A state court's "[f]actual determinations . . . are presumed correct absent clear and convincing evidence to the contrary." *Miller-El I*, 537 U.S. at 340 (citing § 2254(e)(1)).

Nonetheless, "deference does not imply abandonment or abdication of judicial review. . . . A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable[.]" *Id.*; *see also Rice v. Collins*, 546 U.S. 333, 338 (2006) (stating that under AEDPA, we "must find the state-court conclusion 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" (quoting 28 U.S.C. § 2254(d)(2))); *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) ("[A] decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence."). Thus, we may grant the habeas petition only "if it was unreasonable [for the state court] to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338; *see also Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) (explaining that we do not reverse the state court's decision to credit a race-neutral reason "unless the reason given is completely outlandish or there is other evidence which demonstrates its falsity"), *cert. denied*, 130 S. Ct. 3503 (2010).

Harris first argues that the prosecutor's purposeful discrimination is evidenced by "sheer mathematics." Disparate impact upon a particular race is not sufficient to establish purposeful discrimination. *Hernandez*, 500

U.S. at 359-62; *see also Mahaffey*, 588 F.3d at 1146 ("[M]ore than 'bare statistics' is required to prove purposeful discrimination.") (quoting *Miller-El II*, 545 U.S. at 241). But disparate impact "should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent." *Hernandez*, 500 U.S. at 362; *see also Miller-El I*, 537 U.S. at 342 ("In this case, the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors.").

Sixty prospective jurors were questioned during *voir dire*. Four of them were excused by the court for cause or hardship. The State used at least 15 of its 20 peremptory strikes, or 75%, on African Americans. If Riley and Shealy are included in the calculation, these numbers rise to 17 of 20 and 85%. Although the record does not reveal the race of all 60 jurors under consideration, at oral argument, respondent's counsel stated that 21 of the examined prospective jurors were African American and that the defense excluded one of them. Harris did not dispute these numbers in his reply argument. Hence, African Americans composed 35% (21 of 60) of the prospective jurors under consideration. The State removed at least 71% of them (15 of 21). This number rises to 81% if Riley and Shealy are included. Thus, the State used its peremptory strikes to eliminate nearly all the African American prospective jurors.

We are aware that Harris has not challenged every peremptory strike the State used on an African American; he challenges 9 of the 17 strikes. But that does not make

the pattern of strikes any less probative. *Cf. Miller-El II*, 545 U.S. at 240-52 (considering prosecutors' challenges of 91% of the eligible African Americans and concluding that the prosecutors' strikes of 2 African Americans were because of their race). The State's disproportionate use of its peremptory challenges to exclude African Americans must be taken into account in deciding whether the State struck venirepersons because of their race. And its use of peremptory challenges to remove nearly all African Americans must also be considered. This pattern of peremptory strikes against African Americans gives rise to an inference of discrimination.

At the *Batson* hearing, the trial court stated that it was considering the use of peremptory strikes in their context: "I have considered the use of the peremptory challenges in this case and I have particularly considered them within the context that they were used, that is, the context of the jury being constructed as it were." Yet the trial court's analysis reflects only that it examined each challenged strike individually. The court's comments do not reveal that in the third step of its *Batson* analysis, it weighed the fact that the State used at least 75% of its peremptory strikes on and excluded at least 71% of the African American prospective jurors—telling circumstances underlying each and every strike. This evidence of pretext was not confronted but rather was overlooked by the trial court in assessing the prosecutor's credibility as to the reasons for using peremptory challenges on certain African Americans.

The Illinois Supreme Court noted that both sides used all their 20 peremptory challenges, 2 African Americans

served as jurors, 1 served as an alternate, and it was undisputed that the State used 15 of its 20 peremptory challenges on African Americans. *Harris II*, 647 N.E.2d at 898; *Harris I*, 544 N.E.2d at 377-79. The court also said that "the record demonstrates a pattern of strikes by the State against 15 venirepersons whose only common characteristic was that they were black" and agreed with the trial court that this established a prima facie case of discrimination. *Harris I*, 544 N.E.2d at 379. But we can find no indication in the state court's decisions that it took this pattern of strikes into consideration when reviewing the trial court's decision at the third step of the *Batson* analysis. Like the trial court, the state supreme court examined each challenged strike and each reason given for a strike individually and without giving weight to the overall picture that points to the conclusion that the prosecution acted with discriminatory intent in using peremptory challenges.

The trial court did observe that the State used a number of peremptory strikes against African Americans in the first group of jurors under consideration, but found it "particularly significant" that during the same period of time the State accepted an African American juror, Abbott. The court's consideration of this fact was proper. *See United States v. Nichols*, 937 F.2d 1257, 1264 (7th Cir. 1991) (noting that 3 African American jurors were seated while the government still had peremptory challenges available which suggested the prosecutors had no discriminatory intent). Actually, the record shows that the State accepted another African American, Cham-

bers, around the same time. Both of them were accepted early in the jury selection process while the State still had most of its peremptory strikes. As noted, though, the State excluded at least 71% if not 81% of the African Americans under consideration from the jury. These numbers are staggering. The "total or seriously dispro-portionate exclusion of [African Americans] from jury venires is itself . . . an unequal application of the law . . . as to show intentional discrimination." *Batson*, 476 U.S. at 93 (internal quotations and citation omitted); *see also Miller-El II*, 545 U.S. at 241 ("The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members . . . . Happenstance is unlikely to produce this disparity." (quoting *Miller-El I*, 537 U.S. at 342)).

*Batson* instructs that in deciding if a defendant has shown purposeful discrimination, courts must consider "'such circumstantial and direct evidence of intent as may be available.'" 476 U.S. at 93 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also id.* at 96 (directing courts to consider "all relevant circumstances" in deciding if a defendant has shown purposeful discrimination). The Court reiterated this point in subsequent decisions applying *Batson*. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) ("[I]n considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted."); *Miller-El II*, 545 U.S. at 251-52 ("[T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess

the plausibility of that reason in light of all evidence with a bearing on it."); *Hernandez*, 500 U.S. at 363 ("An invidious discriminatory purpose may often be inferred from the totality of the relevant facts." (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976))). These decisions were not "clearly established Federal law" at the time of the state court's rulings in Harris's case, but they do reflect the Court's understanding of *Batson*'s requirements.

At least one circuit has held that in deciding a *Batson* claim, a state court's failure to consider all available evidence, including a pattern of strikes against members of one race, was an unreasonable application of law. *See McGahee v. Ala. Dep't of Corrs.*, 560 F.3d 1252, 1261-66 (11th Cir. 2009). And another circuit has concluded that a court's failure to consider all the evidence in the record, specifically comparative evidence, when ruling on a *Batson* claim resulted in an unreasonable determination of facts. *See Kesser v. Cambra*, 465 F.3d 351, 358 (9th Cir. 2006) (en banc). For our part, we have said that in "incorrectly recount[ing] much of the record and fail[ing] to note material portions," a district court misapplied *Batson*. *Stephens*, 514 F.3d at 713. As a result, we could not defer to the district court's decision finding intentional discrimination. *Id.* at 712 ("[D]eference is due only when a . . . court properly performs its task in the first instance. . . . [W]e cannot defer to a . . . decision that ignores material portions of the record without explanation."). The State's acceptance of 2 African American jurors and 1 alternate juror cannot overcome the clear evidence in the record that the prosecution excused nearly all the other African American prospective jurors.

This disparate impact raises an inference of discrimination and must be given appropriate weight in deciding whether Harris has proved a *Batson* violation.

Even more compelling, though, is the fact that the State's proffered reasons are simply unbelievable in light of all the evidence presented in the State court proceeding, even when viewed under the highly deferential standard of review that constrains us here. Many of the justifications the prosecutor gave for striking African Americans simply do not hold up under scrutiny—the prosecutor misstated or mischaracterized the record. And this bears on the assessment of the plausibility of the other justifications given for a particular strike—reasons that might otherwise be deemed race-neutral. *See, e.g.*, *Miller-El II*, 545 U.S. at 252 (noting the "pretextual significance" when a prosecutor's stated reason does not hold up); *Kesser*, 465 F.3d at 360 ("A court need not find all nonracial reasons pretextual in order to find racial discrimination."). Further, a comparative juror analysis shows that the purported reasons for striking certain African Americans were not equally applied to non-African Americans. This, too, is evidence of pretext. And each challenged strike and inference of pretext must be considered as it bears on the others. The pretextual significance has not been explained away.

The only reasonable inference that can be drawn from the record is that the proffered reasons were pretexts for purposeful race discrimination. The state court's contrary finding was based on an unreasonable determination of the facts and thus its decisions were unreasonable. We reach this conclusion with some hesitation; we

are well aware of the great deference we owe to the state court's factual determinations and we do not lightly overturn its findings. But we cannot shy away from the powerful evidence in the record that Harris has proved purposeful race discrimination. Keep in mind that one discriminatory strike is enough to show an equal protection violation; as will be shown, we conclude that no less than 5 of the strikes should have been disallowed under *Batson*.

### Lucille Woodard

Let's begin with Lucille Woodard. In explaining the use of a peremptory strike against her, the ASA said:

> As to Lucille Woodard, there were missing elements in her [juror] card. The fact that she was divorced. There was no indication of where her husband had been employed, and the age of the juror was not indicated on the card either.

> The area that Lucille Woodard lived is basically the same area where this incident took place, but overall, I will say that I did not have a lot of information about Lucille Woodard. There was nothing that jumped out at me that would make her an unacceptable juror the way many of the other jurors that I have been mentioning did.

The ASA continued:

> And I think *from what I have been able to glean from the transcript* is that she was not excused by the State or by the defense at the end of that day.

It's my understanding that she was still under consideration as a potential juror the next day. The questioning of her was somewhat truncated probably because of the hour when she was questioned.

She was . . . one of the very last jurors to be questioned that day, if not the last one, and what would happen then, if I may state for the record, because it definitely influences the way I select jurors, the way I did select jurors in this courtroom.

What your Honor would do would be to have 14 people in the jury box, and you would question each and every one of them as a group, and then we would excuse ourselves to your chambers where we would put out the cards in the order that they are in the jury box, and then the State would select the four jurors in line that would make up the first panel, and the second panel, and the third panel, exercising peremptory challenges in your chambers area, out of the view of the jury itself.

What would have happened with Lucille Woodard is that when we began the next session with new jurors, she would have been sitting in the first seat herself, and then we'd complete the box filled up with new potential jurors.

I don't have a clear recollection of Lucille Woodard. I don't remember her from the questions that were asked of her, *and it's very probable that I did not remember a lot about her the next day.*

(Emphasis added). The ASA explained that Woodard was seated in the jury box with 13 prospective jurors he had just heard about and of whom he "would have had a very keen knowledge." But for Woodard, "the information was very sketchy to begin with, and by the next day I'm sure it was much sketchier." He added:

> *I believe* I exercised a peremptory challenge against Lucille Woodard because of that lack of knowledge and the fact that her card wasn't complete, . . . but also because I had new jurors in the box that, from that next day, that I did have very good information about, and jurors that I did want to have on my jury, and not just jurors that I did not want.

(Emphasis added). The Illinois Supreme Court concluded that this was a race-neutral, clear, and reasonably specific reason for exercising the peremptory challenge. *Harris I*, 544 N.E.2d at 383. The court determined that "the State . . . knew precisely why it exercised its challenge: the State exercised its challenge because due to the timing and order of questioning during *voir dire*, the prosecutor had lost his recollection of the . . . venireperson. As a result, the prosecutor did not have enough information about the venireperson to feel comfortable with having her on the jury." *Id.* The State's decision is unreasonable.

True, Woodard was the second to last venireperson examined on the first day of trial and was still under consideration the next day when 11 others were examined before the exercise of any further peremptory strikes. *See id.* at 382. The ASA said that the questioning

of Woodard was somewhat truncated. To the contrary, the trial judge asked 21 questions of Woodard on the following subjects: where she lived, her occupation, her employer, her length of employment, her prior employment, where she attended high school, how long she lived in Chicago, the type of work her former husband did, her child, whether she or any close friends or family members had ever been a crime victim, and when she answered affirmatively, the judge asked her about the circumstances of the victimization and whether that would interfere with her ability to hear the case on trial and give both sides a fair trial. The judge also asked her whether she or any close friends or family members had ever been accused by the police of any criminal matters, and again questioned whether she could give both sides a fair trial in the case. Nothing in the record suggests that the questioning of Woodard was truncated. Questions comparable in number and topic were put to the other venirepersons, even those questioned on the second day of jury selection.

Furthermore, the record shows that the ASA did not know why he struck Woodard. No doubt the passage of time played a part in his inability to recollect the reasons for striking her. *See Miller El I*, 537 U.S. at 342-43 (noting that the evidence presented at the *Batson* hearing two years after the trial was "subject to the usual risks of imprecision and distortion from the passage of time"). The ASA's testimony at the *Batson* hearing suggests that he was not reciting his recollection of his reasons for the strike but rather was looking at the record and trying to come up with race-neutral

reasons to justify the strike. (This was true throughout his testimony at the belated *Batson* hearing.) It is insufficient for a prosecutor merely to identify race-neutral reasons why the State *could have* exercised a strike against a prospective juror; instead, "the prosecutor must give a 'clear and reasonably specific' explanation *of his 'legitimate reasons' for exercising the challenges*." *Batson*, 476 U.S. at 98 n.20 (quoting *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 258 (1981) (emphasis added)). The ASA testified that at the time he exercised the strike, he lacked information about Woodard and probably could not recall much about her from the day before. If he didn't have a clear recollection of Woodard the very next day after she was questioned, we can reasonably doubt that his memory had improved by the time of the *Batson* hearing more than 3 years later. If the ASA is to be believed, he basically wasted a peremptory strike on Woodard. That would contradict his claim that the State's exercise of strikes was based on comparative choices among jurors and gives rise to an inference that the proffered reasons for striking Woodard were pretexts for discrimination.

It is true that the trial court's credibility determinations are to be given substantial deference. This is based on the concept that the trial judge is intimately involved in the jury selection process and is face-to-face with the participants. But the discussion of the ASA's credibility by the trial judge did not take place during the jury selection process, shortly after the exercise of the challenged strikes. Instead, the court's comments were made some 3 years after the strikes were made. And as

we discuss throughout this opinion, the ASA's explanation of the reasons for the strikes appears to have been recreated, principally from reviewing the transcripts of the jury selection process, again roughly 3 years after the strikes were used. We don't doubt that the ASA appeared to be sincere when giving his testimony about the strikes. But the problem is that his stated reasons for the Woodard strike (and others that we discuss) are contradicted by the comparison with other jurors that were acceptable to the State. As such, the conclusory comments by the trial judge about the ASA's credibility ring hollow. *Cf. Miller-El II*, 545 U.S. at 241 n.1 (suggesting that a lengthy delay between *voir dire* and the post-trial *Batson* hearing weakens the deference due state courts' factual findings); *Rutledge*, 648 F.3d at 562 (recognizing that the passage of time may preclude the trial court from making findings as to the prosecutor's credibility at *Batson*'s third step); *United States v. McMath*, 559 F.3d 657, 666 (7th Cir. 2009) (noting that the "passage of time [may] make it impossible for the [trial] judge to make findings of fact" but a "remand may be more worthwhile in this case, as voir dire occurred only a little over a year ago").

Although the Illinois Supreme Court did not discuss the other reasons given for striking Woodard, the trial judge did refer to them. He said that "in considering all of the reasons given . . . I cannot conclude that the peremptory challenge used on Lucille Woodard was used for a racially motivated reason." As support, he noted that the State had accepted Abbott, an African American, about the same time that it struck Woodard. The judge also

reasoned that he thought it was proper to make comparative choices among jurors, as long as the comparisons did not take race into account. The fact that the ASA claimed that he struck Woodard because of a lack of knowledge about her while at the same time proceeding to offer several specific reasons for striking her is quite troubling. If the ASA struck her because he didn't have a clear recollection of her, then these other explanations ring hollow.

On appeal, respondent asserts that the ASA merely mentioned Woodard's divorce, age, and residence—these were not the reasons for striking her. The record provides no support for this view, which is inconsistent with respondent's arguments as to other challenged jurors for whom he defends the strike on all the reasons "mentioned" by the ASA. And if we accept the view that the ASA merely mentioned these facts and didn't rely on them as justifications for the strike, his testimony would tend to show that he kept throwing out possible race-neutral reasons for the strike until he thought he found one that would be accepted. As noted, any old reason doesn't cut it; the prosecutor must state his reason for using the challenge. *See Batson*, 476 U.S. at 98 n.20.

And there is more. The ASA's recitation of reasons why he may have struck Woodard is inconsistent with other parts of his testimony. The ASA noted that Woodard was divorced; respondent has stated that the ASA was concerned about Woodard's divorce. Yet a few moments later, the ASA claimed that nothing about Woodard jumped out at him that would make her an unacceptable

juror. What happened to his concern about her divorce? And if Woodard's divorce was a concern to the ASA, then he should also have been concerned that non-African Americans Theresa Najdowski and Ann Folan were divorced. Nevertheless, the State allowed them to serve on the jury. Respondent argues that Folan is not an appropriate comparator because the State had exercised all of its peremptory strikes by the time she was under consideration, but as we explain below, the Illinois Supreme Court's finding that the State had exercised all its peremptory challenges before the white teacher (Folan) was questioned, was an unreasonable factual determination. As for Najdowski, respondent argues that although she was divorced, she was the first person questioned in the venire so she would have been fresh in the ASA's mind when he considered her, in contrast with Woodard. That may be true. But it does not explain why the fact of Woodard's divorce supposedly mattered to the ASA, yet he did not likewise find Najdowski's and Folan's divorces reasons to challenge them. That he didn't tends to prove purposeful discrimination.

In considering the strike of Woodard in light of all relevant circumstances, the only reasonable inference that can be drawn is that she was excluded because of her race. It was unreasonable for the state court to credit the race-neutral reasons for striking her.

### Wilbert Stearn

Wilbert Stearn is a struck juror for whom the State's race-neutral justification simply doesn't hold up. At the time of the trial, Stearn was employed as a steel worker;

he previously had been a grammar schoolteacher for several years. The ASA also noted that Stearn was a music major in college and his wife was a teacher. He was quite critical of Stearn's job change. He claimed that Stearn's move from a teaching position, which he had held for many years and for which he had gone to graduate school, to a blue-collar type job "was a matter that gave [him] pause." The ASA said that "without having had a chance to talk to him at length and get to know him better, I did not feel that I could understand exactly what Mr. Stearn would do on that jury or what his feelings or prejudices might be. . . . He was not the type of juror from . . . his background, that I would have wanted on my jury."

There is nothing suspicious about Stearn's job change. As the father of 7 children, it is unsurprising that he would leave his teaching job for what no doubt was a higher paying job. The trial court erred in finding that there was "something suspicious" about a person who was a teacher "who took another job of conceivably a lesser status, although a higher pay." This explanation for striking Stearn smacks of pretext.

Job change aside, Stearn otherwise fits the prosecutor's description of a desirable juror. The fact that a stricken juror "should have been an ideal juror in the eyes of a prosecutor" is one of those relevant circumstances to be considered in deciding whether Harris has raised an inference of purposeful discrimination. *See Miller-El II*, 545 U.S. at 247. The ASA claimed that he was "basically looking for people that ha[d] strong roots to the com-

munity" and "a substantial investment in living in the city." He said that he considered such factors as whether they were homeowners, whether they had lived in the same community or location for a number of years, the types of jobs they had, how often they changed jobs, how long they had been at their current job, and whether they had advanced, moved laterally or moved down, and if they have families, whether their families had roots in the community. Granted, the ASA also said that he considered whether the juror had changed professions from a "more academically oriented profession to a less academically oriented profession or vice versa." At the time of the trial, Stearn was 53 years old, married, and, as noted, the father of 7 children. He had lived in Chicago for almost 20 years and owned his own home where he had lived for 15 years. He was employed as a roller line leader at U. S. Steel, where he had worked for 14 years, and he was well-educated with a bachelor's degree and 1½ years of graduate studies in education.

The Illinois Supreme Court noted Harris's claim that Stearn "had strong ties to the community" and then said that "[t]hough a minority venireperson may otherwise possess all of the traits which the State is looking for in a juror, he may possess an additional trait which makes him undesirable." *Harris I*, 544 N.E.2d at 382. The court next discussed the contention that the State allowed a white teacher (Folan) onto the jury, correctly observing that "evidence that a stricken minority venireperson possessed the same characteristics as a nonminority juror . . . [accepted by the State] should certainly be

given great weight by the trial court in evaluating the State's explanations." *Id.* Nonetheless, the court concluded that the fact that a white teacher (Folan) served on the jury did not give rise to pretext because "by the time the white teacher was questioned during *voir dire*, the State had exercised all of its peremptory challenges. As a result, the State had no choice as to whether or not it should exercise a peremptory challenge." *Id.*

Harris has shown that the State used its 20th and final peremptory challenge against Robert Allan, who was questioned right before Folan, and the State did not exercise this challenge until after Allan, Folan, and several others had been questioned. Therefore, the state court's determination that by the time the white teacher (Folan) was questioned during *voir dire*, the State had exercised all of its peremptory challenges and thus could not decide whether or not to exercise a challenge against her, was based on an unreasonable determination of the facts. The fact that this justification for striking Stearn—because he was married to a teacher—would apply equally (if not more so) to Folan who herself was a teacher, and the fact that the State had the opportunity to strike her but did not, shows that this explanation was pretextual. Moreover, the fact that the State accepted Folan but struck Stearn should have been given appropriate weight by the state court in evaluating the State's justifications for striking Stearn. It wasn't, though, since the state court erroneously rejected the comparison of Stearn to Folan.

The final reason offered to explain the strike of Stearn was that he was a music major. The ASA explained that

a person with a music or other liberal arts major was the type of person who tends to be creative and considers matters outside the evidence and may go beyond the strictures of the law. Although this explanation made "no sense" to the trial judge, he credited it, noting that it had to be "scrutinize[d] to see whether that is a cover for a racial motivation[.]" Although the Illinois Supreme Court mentioned this explanation, it did not directly address it. *See id.* at 381-82. The implausibility of the music major rationale is reinforced by the pretextual significance of the other justifications offered for the strike of Stearn. *See, e.g., Snyder*, 552 U.S. at 478; *Miller-El II*, 545 U.S. at 251-52.

The only reasonable inference that can be drawn from all the circumstances in the record is that the reasons offered for the strike of Stearn were pretexts for discrimination. Thus, the state court's acceptance of the prosecution's justifications for the strike of Stearn was unreasonable.

### Essie Taylor

It was also unreasonable for the state court to credit the prosecutor's race-neutral explanations for striking Essie Taylor. The ASA said: "As to Essie Taylor, there was very limited questioning as to [her] in the record. There was no questioning at all about the husband's self-employed status. I did not know where he worked or in what capacity or what profession he was even in. Even though there was an indication on the [juror] card that he was self-employed." It is true that Taylor did not

provide complete information about her husband's employment and was not asked about his employment during *voir dire*. The Illinois Supreme Court found this to be a race-neutral reason for striking her. *Harris II*, 647 N.E.2d at 901.

But the ASA also claimed that the area Taylor lived in "was relatively close to the area where this incident had occurred." As it turned out, however, Taylor actually lived 3½ miles away. At best, the ASA was simply mistaken in his belief about the proximity of Taylor's residence to the crime. Initially, the trial court thought that striking Taylor because she lived "reasonably within the area of the city" where the defendant lived was a race-neutral reason. (The Illinois Supreme Court noted that the trial court thought Taylor lived within one mile of Harris. *Harris I*, 544 N.E.2d at 385.) The trial court's finding was not supported by the record and was erroneous, and accordingly was rejected by the Illinois Supreme Court. *Id.* And so the case was remanded. *Id.* On remand, the trial court found that Taylor lived relatively close to the area where the incident occurred, concluding that 3½ miles could be described as "relatively close," and further found that this was a race-neutral reason for excluding her.

These explanations, however, become quite suspicious when viewed in the context of the ASA's additional justification for striking Taylor. Similar to Woodard, he claimed:

> And it was because of a lack of information and lack of knowledge that I did not feel I had a good

> handle on Essie Taylor. I did not find her to be the kind of a juror that I was going to exercise automatically . . . a peremptory challenge [against], but it was because of other jurors that I wanted on my jury that I believe Essie Taylor was excused[.]

However, the ASA could not recall which prospective jurors were in the same block of jurors that was considered by the parties at the time Taylor was stricken. Instead, he gave an explanation of the general qualities that he looked for in jurors:

> . . . I am basically looking for people that have strong roots to the community, that have substantial investment in living in the city[.] . . .

> I look to the fact if they are homeowners, that they have lived in a certain community or certain residence for a number of years.

> If they are renters, if they have lived in that location for a number of years.

> The types of jobs they have, how often they have changed jobs, how long they have had the most recent job, if they have advanced within the company that they stayed at for a number of years, or if they have moved laterally or down.

> If they have changed professions from a more academically oriented profession to a less academically oriented profession or vice versa.

> If they have families, if their families have roots in the community.

On the second remand, the trial court found that Taylor was excused for a race-neutral reason, citing the lack of information and knowledge about her and because there were other persons the ASA wanted on the jury. The Illinois Supreme Court noted that the trial judge found that the latter was a race-neutral reason and credited it as a reason for challenging Taylor. The state supreme court did not believe that this reason was "clearly pretextual" and, because it sustained the challenge to Taylor on the other grounds, the court did not consider it further. *Harris II*, 647 N.E.2d at 901-02.

The trial court concluded that "[the ASA] was truthful when he said that there were 'other jurors that he wanted on [his] jury' because . . . Najdowski, Abbott, and [Joseph] Tomsyck became jurors in this case." The court added that it appeared the ASA "was attempting to gain an educated, older, conservative, more stable juror." But the court erred in comparing Taylor to Najdowski, Abbott, and Tomsyck. They were selected as the first panel and sworn in as jurors at the end of the first day of trial. Taylor, as the trial court noted, was among the first 8 venirepersons questioned the morning of April 24, 1984, the second day of trial. Thus, Najdowski, Abbott, and Tomsyck already had been chosen and sworn as jurors before Taylor was even questioned. The exercise of a peremptory strike against Taylor would have no effect on whether they would be on the jury; they already were. It would have been appropriate to compare Taylor to the jurors who were under consideration at the same time as she: Woodard, Tony Galovic, Claudia Conway, Soo Gyang, Meldena Ley, Harold Deitche, Eva Morales,

Christine Riley, Lucille Johnson, Richard Gray, and Myland Craig. Some of them, such as Gray, Conway, Gyang, and Ley, appear to have been what the ASA was looking for in a juror—older, educated, or stable.

But Taylor also met the description of what the ASA said he was looking for—people having strong roots to the community and a substantial investment in living in the city. Taylor was a 35-year-old nurse, married, and the mother of 2 children, ages 12 and 15. She had attended high school in Chicago and had lived there at least 17 years. She had been employed at Mount Sinai Hospital for four years. Before that, she was a stay-at-home mom who cared for her young children. And she had worked at Mount Sinai before staying home. The ASA's supposed concerns about Taylor in the face of her strong ties to the community, stable family, and stable employment are unconvincing and give rise to an inference of pretext for purposeful discrimination. That inference has not been rebutted. Thus, it was unreasonable for the state court to credit the proffered reasons for striking Taylor.

### Betty Simmons

The State's explanations for striking Betty Simmons are also unconvincing. The ASA stated that Simmons's husband was unemployed and she had indicated that her son had gone to court because he had been a victim of an armed robbery and it was not clear to the ASA "what the disposition of that armed robbery case had been, nor whether she was satisfied with the treatment

her son had received." (Simmons said that her son was "held up" about 2 years before, authorities found the person, and her son had to go to court. She also said that there was nothing about that which would interfere with her ability to be a fair juror.) The ASA further stated, "Again, I did not feel I had a great amount of knowledge regarding Betty Simmons. Her ties to the community seemed to be tenuous, and in comparison to the other jurors I was considering at that time, I did exercise a peremptory challenge."

The claim that Simmons's ties to the community "seemed to be tenuous" is incredible. At the time of the trial, Simmons was 45 years old. She was married with 2 children (ages 14 and 23). She owned her own home. She was employed as a staff clerk for Illinois Bell Telephone Company where she had worked for 25 years. She had attended high school in Chicago. Any claim that Simmons's ties to the community seemed tenuous could not be further from reality. The trial court neglected to make a finding as to Simmons at the *Batson* hearing, but on remand, it, too, rejected this proffered explanation. This utterly incredible explanation is indicative of pretext. Respondent has not offered anything to rebut the inference of pretext.

The trial court also credited the ASA's other reasons. A pretextual reason bears on the plausibility of other reasons given. *See, e.g., Snyder*, 552 U.S. at 478; *Miller-El II*, 545 U.S. at 251-52. The ASA claimed he made a comparative choice among jurors. When Simmons was struck, 8 other venirepersons also were excused and the sec-

ond panel of jurors was sworn: Richard Gray, Helen Karwowski, Michael Dolan, and Lois Gregg.[2] The State's acceptance of Gregg is particularly troubling. The ASA had stated that he rarely accepted jurors who were teachers or spouses of teachers. Gregg's husband was a teacher (a professor), yet this didn't motivate the ASA to strike her. This is evidence tending to prove that his juror comparison rationale is a pretext for discrimination. *See Miller-El II*, 545 U.S. at 241.

The ASA also justified the strike of Simmons based on her husband's unemployment; the Illinois Supreme Court found a prospective juror's spouse's unemployment a valid concern that may be considered in exercising a peremptory challenge. *See Harris II*, 647 N.E.2d at 902-03. The state court also accepted the explanation that the prosecutor struck Simmons because of uncertainty about her son's armed robbery case and whether she was satisfied with the treatment her son had received. *See id.* It was unreasonable for the state court to accept

---

[2] A portion of the trial transcript indicates that Helen Wojcik was on the second panel, Tr. R. vol. 2 at 313, which is inconsistent with an earlier portion of the transcript that shows she had been excused along with 4 other venirepersons and with the trial judge's oral and written findings that Helen Karwowski was on the second panel. Oral Findings of Fact & Conclusions of Law, entered April 20, 1990, 21; Findings of Fact & Conclusions of Law Regarding the State's Explanations for Excluding 13th, 14th, and 15th Persons from Jury Service, entered April 23, 1990, 16. The indication that Wojcik was on the panel was erroneous.

these other explanations in light of the pretextual explanation that Simmons' ties to the community seemed tenuous and in light of all the other circumstances that tend to prove racial discrimination in the State's use of peremptory strikes to exclude nearly all the African Americans.

**Milton Pickett**

And then there is Milton Pickett. The ASA testified that he exercised a strike on Pickett because his wife was a teacher. The ASA said he rarely accepted jurors that are teachers or spouses of teachers. He explained that teachers often are very sympathetic and want to give people, especially young people, the benefit of the doubt. He added that teachers often ask questions that "go beyond the law" and tend to "second guess some of the strictures that the court places on them." But the ASA also said that his "main reason" for striking Pickett was not because he was married to a teacher, but because there was a colloquy between the trial judge and Pickett in which Pickett said he was friends with a lawyer who was a city councilman (in Evanston, Illinois). The ASA stated that the judge identified the friend (Fred Alexander), and Pickett seemed impressed that the judge recognized or knew the person he had mentioned. The ASA continued by saying that he did not know the lawyer-councilman or his politics and thought it best, based on this lack of knowledge as well as a lack of information about the importance of this friend in Pickett's life, to exercise a peremptory challenge on Pickett.

The ASA could have asked the trial judge who was conducting the *voir dire* to question Pickett about the significance of the friend and the friend's politics, if the ASA truly was concerned about those matters. The record reveals that after the judge questioned Pickett and 8 other venirepersons, he called the lawyers up to the bench and had a conversation off the record. We do not know what was said, but we do know that immediately after that conversation, the judge put an additional question to 4 of the prospective jurors under consideration. At the *Batson* hearing, the trial judge found that although he generally asked the questions during *voir dire*, this wouldn't preclude either side from tendering questions, but neither side generally did, and in Harris's case specifically, neither side did. The Illinois Supreme Court observed that asking prospective jurors "further questions can threaten to taint the entire venire through the disclosure of sensitive information and can unnecessarily lengthen an already long process," *Harris II*, 647 N.E.2d at 899, concerns it found legitimate, *id.* Even so, the prosecutors had a perfect opportunity to ask the trial judge to put further questions to Pickett about his lawyer-councilman friend, but didn't do so. This may suggest that this justification for striking Pickett was merely a pretext for discrimination. *See Miller-El II*, 545 U.S. at 246 (expressing disbelief about the proffered reason for the strike and noting that "the prosecution asked nothing further about the . . . [issue], as it probably would have done if the [issue] had actually mattered").

Further evidence of pretext is found in the other justifications given by the prosecution. The ASA stated that

Pickett was self-employed as a barber, and while in trial would have a loss of income. In *Snyder*, the prosecutor attempted to justify striking an African American on the ground that the prosecutor was concerned that the prospective juror was a student teacher and might be motivated to find the defendant guilty of a lesser-included offense so to avoid a penalty phase and minimize the classes missed. 552 U.S. at 478-80. The Court found this explanation pretextual for several reasons, including that once the juror was informed that the dean would "work with" him to make up any missed student-teaching time, the record did not suggest that the juror remained concerned about jury service. *Id.* at 482-83. Pickett's juror card indicated that he was employed by Baxter Travenol and listed his occupation as "lift driver." During *voir dire*, he testified that he drove a forklift from 7:00 a.m. to 3:30 p.m. and worked as a barber from 4:00 p.m. to 7:00 p.m. Pickett never expressed any concern that jury service would cause him a loss of income or otherwise interfere with his work obligations, either as a barber or forklift driver. Under these circumstances, it was unreasonable to credit the "loss-of-income" reason for striking Pickett.[3]

And there's more. The ASA justified his strike of Pickett by noting that his wife was a teacher. As noted,

---

[3] The trial judge never explicitly credited this as a reason for striking Pickett. Only the Illinois Supreme Court did, *Harris II*, 647 N.E.2d at 900, but that court was not in a good position to judge the prosecutor's credibility.

the ASA claimed that he usually did not accept jurors that are teachers or spouses of teachers and gave a few reasons why he did not like having them as jurors. These same reasons should have given him reason to strike Folan, a teacher, and Najdowski, a former teacher, both non-African Americans. Respondent argues that Folan is not an appropriate comparator because the State had exercised all of its peremptory strikes by the time she was under consideration. As noted, the Illinois Supreme Court so found. *See Harris I*, 544 N.E.2d at 382. But, as addressed above, this finding was based on an unreasonable determination of the facts. Our review of the record reveals no possible explanation for the patent inconsistency in the State's exclusion of African Americans because they or their spouses were teachers and its acceptance of non-African American teachers and former teachers.[4] Thus, the fact that the State didn't strike Folan and Najdowski is evidence of pretext and discrimination. *See, e.g.*, *Miller-El II*, 545 U.S. at 241 ("[I]f a [party's] proffered reason for striking [a prospective juror of one race] applies just as well to an otherwise-similar [juror of a different race] who is permitted to serve, that is evidence tending to prove purposeful discrimination[.]").

---

[4] Harris has not argued to us that Najdowski would be an appropriate comparator to Pickett. Presumably because Harris didn't compare Pickett to Najdowski, respondent did not attempt to explain why such a comparison would be unavailing. Harris did argue, however, that the prosecutor's explanation that Pickett was stricken because his wife was a teacher was pretextual.

The Illinois court failed to consider the fact that the "teacher reason" offered by the State for striking Pickett applied equally to Folan and Najdowski. *See Harris II*, 647 N.E.2d at 900; *Harris I*, 544 N.E.2d at 383-85. Yet this was a relevant circumstance that should have been given due weight by the court in deciding whether to credit the prosecutor's proffered reason for striking Pickett. In the absence of some explanation for this difference in treatment of like jurors of different races, the conclusion that the proffered reason was a pretext for purposeful discrimination becomes inescapable. The state court unreasonably accepted the race-neutral reasons for the strike of Pickett.

### Christine Riley

And even more telling is the State's justification for its peremptory strike against Christine Riley. Harris challenges the strike of Riley in the context of his claim under *Strickland v. Washington*, 466 U.S. 668 (1984), which set forth principles governing ineffective-assistance-of-counsel claims. To succeed on such a claim, Harris would have to show that his counsel's performance was deficient—"fell below an objective standard of reasonableness"—and "the deficient performance prejudiced the defense"—"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687-88, 694. The Illinois Supreme Court resolved the *Strickland* claim by concluding that Harris suffered no prejudice as a result of counsel's failure to establish

Riley's and Shealy's race. *Harris III*, 794 N.E.2d at 326-31. Because the *Batson* claim involving Riley has merit, this conclusion is unreasonable.

The ASA justified the strike of Riley as follows:

> She lived in the Hyde Park area. She had a nephew that she indicated had been stabbed just three months before the time she was being voir dired, and she told your Honor that she didn't know what had happened to her nephew. She then indicated that it was a fight and she didn't seem to know who was charged, or if her nephew was charged or the other party or parties had been charged.
>
> It seemed very possible that, after hearing her response, that her nephew may have been the considered target of investigation or a charged individual in that case, and it was not clear to me whether she was telling the Court and the attorneys all she knew about this matter, and I did not feel that her responses were such that she would be a juror that I would want sitting at this trial.

He added that Riley "indicated that she was separated from her husband, and again, her card was incomplete as to her husband's employment and other information regarding her husband. I did not know what the reason for that was[.]" The ASA expressed concern that there may have been "some friction or animosity there that may have made her have some emotional feelings or may have made her an [un]acceptable juror to consider this case."

The explanation based on the premise that Riley's nephew may have been the target of an investigation or charged in a criminal case demonstrates pretext and discriminatory animus. In *voir dire*, when asked whether she had any close friends or relative/s who had ever been the *victim* of a crime, Riley testified that she had a nephew who was stabbed about 3 months before in front of his house on Chicago's south side. She said that he was all right but had spent about one week in the hospital. The prosecutor asked her, "Do you know anything about that, why it happened, or anything of that nature?" Riley answered, "I don't know exactly why. It was a fight. I don't know exactly what happened." When explaining the strike of Riley, as noted, the ASA said that she "didn't seem to know who was charged, or if her nephew was charged or the other party or parties had been charged" and that "[i]t seemed very possible that . . . her nephew may have been the considered target of investigation or a charged individual in that case."

Yet nothing Riley said during *voir dire* reasonably suggested that her nephew had been charged or investigated as a result of having been stabbed. She wasn't even asked whether he or anyone else was charged. She was asked only about the stabbing and why it occurred. And, she was asked whether someone close to her had ever been a *victim* of a crime. That the ASA jumped to the conclusion that Riley's nephew may have been charged as an offender, but did not appear to even consider that possibility when non-African American venirepersons, Richard Gray, Maureen Ring,

Lois Gregg, Michael Dolan, and Norma Peacock, said a family member had been a crime victim, is quite telling. From this racially disparate assumption about criminal responsibility, discriminatory intent is clear.

The trial judge found that the explanation that Riley was struck because she lived in "the community of Hyde Park" and was separated from her husband were race-neutral reasons for excluding her. The Illinois Supreme Court upheld the crediting of the "Hyde Park" reason but did not address the separation. *See Harris III*, 794 N.E.2d at 327-28. Nor did it address the ASA's assumption that Riley's nephew may have been charged. That assumption bears heavily on the plausibility of these other reasons offered to justify Riley's exclusion. And the ASA's concern that because of her separation from her husband, Riley may have some friction or animosity that gave her emotional feelings or made her otherwise unacceptable is implausible. There is no evidence in the record that Riley was experiencing emotional feelings that made her unable to serve as a juror. Without such evidence, it was unreasonable to credit this explanation.

The trial judge's decision to credit the prosecutor's reasons for striking Riley involved an unreasonable determination of the facts. Most troubling, the judge failed to consider what the prosecutor's race-based assumption that Riley's nephew may have been charged shows about his intent. The State's remarkable pattern of strikes against African Americans bears on the plausibility of the other reasons offered to justify the strike

of Riley as well. The Illinois Supreme Court's decision to reject the *Batson* claim as to Riley also was based on an incomplete evaluation of the reasons given and an incomplete assessment of the totality of the circumstances. Thus, we must conclude that the state court made an unreasonable determination of the facts in light of the evidence presented in accepting any of the reasons offered as justification for the strike of Riley. That said, the state court unreasonably determined that Harris failed to show prejudice as a result of *Batson* counsel's failure to establish Riley's race. If counsel had established Riley's race, consideration of the State's strike against Riley could have proved a *Batson* violation.

To sum up, the state court's credibility findings are clearly contradicted by the record and it was unreasonable for the court to credit the prosecutor's race-neutral explanations for striking several African American prospective jurors. The pattern of strikes against African Americans gives rise to an inference of discrimination. The State proffered implausible and pretextual justifications for the strikes. And a comparative juror analysis shows that some of the State's proffered reasons for striking African Americans applied equally to similar non-African Americans whom the State accepted as jurors, which tends to prove purposeful discrimination.

We are aware that *Snyder* cautions that a retrospective comparative juror analysis based on an appellate record has the potential to be misleading when the alleged similarities were not asserted at trial because consideration of the alleged similarities may have

shown that the jurors were not really comparable. 552 U.S. at 483. As our discussion above demonstrates, however, we have taken great care in drawing comparisons, still keeping in mind that prospective jurors need not be identical in all respects for a comparison to be probative. *See Miller-El II*, 545 U.S. at 247 n.6 ("potential jurors are not products of a set of cookie cutters"). And we note that respondent has not argued that Folan was an inappropriate comparator to Woodard, Stearn, and Pickett because they possessed traits that made her more desirable as a juror. *See* Appellee Br. 28 (asserting a side-by-side comparison of Woodard with Folan was inappropriate because the "State had no opportunity to strike Folan"), *id.* at 30 (arguing Folan was not a proper comparator to Stearn because "the State had no opportunity to strike her"), *id.* at 31 (making the same argument with regard to Pickett). Furthermore, the comparative juror analysis is only one aspect of the totality of the circumstances that compels our conclusion that Harris has proved purposeful race discrimination in the jury selection.

We agree that the strikes against Lisa Lucas, Emma Alexander, and Edward Shealy are also quite troubling. Demeanor-based explanations for a strike are particularly susceptible to serving as pretexts for discrimination. The evidence that other African Americans were excluded because of their race bears heavily on the plausibility of the reasons offered for striking these prospective jurors. But Harris has carried his burden of proving a *Batson* violation and so further consideration of these strikes is unnecessary. Also unnecessary is consideration of Harris's *Brady* claim.

### III. Conclusion

The Illinois state court's conclusion that the State did not purposefully discriminate in exercising peremptory strikes on African Americans was based on an unreasonable determination of the facts.[5] We are well aware that the crimes with which Harris was charged occurred almost 30 years ago. But "the passage of time is not a basis for overlooking the prosecutors' violations of the Equal Protection Clause." *Richardson v. Hardy*, No. 00 C 6425, 2012 WL 850732, at *35 (N.D. Ill. Mar. 13, 2012). The district court's judgment is VACATED and this case is REMANDED to the district court with instructions to grant the writ unless the State elects to retry Harris within 120 days.

---

[5] At oral argument, we inquired whether Harris could be sentenced to death if he prevailed on his writ and was retried. We asked Harris's counsel to discuss the matter with him and advise the court whether Harris wishes to go forward with his claim despite any such risk. In *People v. Morris*, 848 N.E.2d 1000 (2006), the Illinois Supreme Court held that the former governor's clemency orders precluded the state from seeking the death penalty in the event of retrial. Thus, it appears that Harris could not be given the death penalty if retried. And his counsel has informed us in writing that even if a death sentence could be imposed following retrial, Harris wishes to pursue his writ requesting the state court to release him or retry him.